14 U.S. 159
 4 L.Ed. 60
 1 Wheat. 159
 THE ANTONIA JOHANNA.
 March 8, 1816
 
 APPEAL from the circuit court for the district of North Carolina. This was the case of a Russian ship, captured on the 2d of June, 1814, by the privateer Herald, on a voyage from London to St. Michaels, and brought into the port of Wilmington, N. C., for adjudication. The ship was chartered by Messrs. Burnet & Co., a mercantile firm at London, for a voyage from London to St. Michaels, thence to Fayal, thence to St. Petersburg or any port in the Baltic, and thence to return to London, at the stipulated freight of one thousand guineas. The ship and cargo were libelled as prize of war, and, upon the hearing in the district court, that part of the cargo which was not claimed was condemned. The residue of the cargo, excepting one moiety of certain packages, claimed on behalf of Messrs. Ivens & Burnett, a mercantile firm at St. Michaels, was restored. The whole freight was decreed to be paid to the master, and charged exclusively upon the proceeds of the property condemned, and the moiety of the property restored to Messrs. Ivens & Burnett. From so much of this decree as respected the controversy between the captors and the claimants of the cargo, an appeal was interposed to the circuit court, where the decree was affirmed, and the cause was brought, by appeal from the latter decree, to this court.
 Wheaton, for the appellants and captors. The cause may be divided into three branches:
 1st. As to the claim for the three invoices of goods shipped by Messrs. Burnett & Co. of London, to Messrs. Ivens & Burnett, of St. Michaels.
 2d. As to the remainder of the cargo.
 3d. As to the order respecting the freight.
 1. There is a hostile trade which will affect the property engaged in it with confiscation, as completely and effectually as a hostile domicil, and that without regard to the national character of the individual. Thus, the produce of an estate in the enemy's country, belonging to a person domiciled in a neutral country, is liable to capture and condemnation.a This principle was adopted and confirmed by this court, in the case of Mr. Bentzen, a Danish subject, resident in Denmark, whose claim to 30 hogsheads
 
 
 a
 5 Rob. 20. The Phoenix. of sugar, the produce of an estate belonging to him, in a West India island possessed by the enemy, was rejected, and the property condemned.b So a vessel purchased bona fide in the enemy's country, by a neutral, continuing in her former trade, is good prize. And the property of a house of trade established in the enemy's country, though some of the parties may be domiciled in a neutral country, in prize of war.d Apply these authorities to the present case: the share of Mr. Ivens cannot escape the same fate with that of his partner domiciled in London; the partnership is domiciled there, and his interest is so mixed up with hostile interests, that it cannot be separated. These principles were recognised by a learned judge of this court, in the first circuit, in the case of the St. Jose Indiano,e the decree in which was acquiesced in by the counsel. Their general spirit was adopted by that venerable tribunal, the continental court of appeals in prize causes, and applied even to a treaty stipulation, that free ships should make free goods, which was held not to extend to a trade carried on by a neutral, but hostile in its nature.f 2. As to the other portions of the cargo, the evidence to restore or condemn must come, in the first instance, from the documentary evidence and
 
 
 b
 Feb. T. 1815.
 
 
 d
 1 Rob. 1. The case of Mr. Cooperman, cited in The Vigilantia. 2 Rob. 251. The Susa. 3 Rob. 41. The Portland. 5 Rob. 302. The Jonge Klassina.
 
 
 e
 Claim of Messrs. Dyson, Brothers, & Fennie.
 
 
 f
 2 Dgll. 34. Darby et al. v . the brig Estern. the examinations in preparatorio. In this case, that is neither sufficient for condemnation, nor does it afford satisfactory grounds for immediate restitution; farther proof ought, therefore, to be ordered. 3. The neutral master is undoubtedly entitled to his freight; but this is not to be charged, exclusively, upon the property condemned and ordered to be sold, whilst the property specifically restored escapes the burden which is imposed, solely upon the ground of an implied performance of the contract on the part of the master. The law says, that capture is equivalent to delivery; it does not say, that condemnation only, in equivalent to delivery, and that, therefore, the portion of the cargo restored, shall be charged with no part of the freight. On the contrary, in a case where the cargo had been unlivered, and the whole was restored upon the original evidence, the freight was held to be a charge upon the cargo, though it was not carried to the port of destination.g But, here, a pro rata freight only, ought to be allowed: but a small part of the whole voyage, for which the 1,000 guineas was stipulated to be paid, was to be performed in the service of this cargo, which was to be delivered at St. Michaels. The master was not bound to wait longer than the first adjudication; indeed, the unlivery completely dissolved the contract between him and the owners of the goods, and entitled the master to whatever freight he might have earned in their service.h
 
 
 Gaston, contra. 1. The captors cannot now object that the freight, decreed in the court below to be paid to the master, was unreasonable in itself, or not chargeable to them. They have acquiesced in this part of the decree, and it has been definitively carried into execution. 2. The goods shipped to Messrs. Ivens & Burnett of St. Michaels, were shipped by order, and on account and risk of that house of trade. The claim, the documentary proof, and the preparatory examinations, are perfectly consistent, and establish that a moiety of this shipment is the property of that house, the partners of which are domiciled in a neutral country; they must, therefore, be regarded as neutral by both belligerants, with reference to the trade which they carry on with the adverse belligerant, and with all the world. In the case of the St. Indiano, it was insisted that the principle of condemnation applied in cases where a partner of a neutral house is domiciled in the enemy's country, and ships to such house, goods, the manufacture of that country; but the position was expressly overruled. Even if the hostile and the neutral house here consisted of the same partners, and the shipment was made from the hostile to the neutral partner, for their joint concern, it would, nevertheless, be contended, that the share of the hostile partner was alone subject to condemnation. However sincere and profound a respect is felt for the learned judges, who are said to have decided that the beligerant character of one partner shall avail to condemn, and the neutral character of the other shall not avail to saver whore the house has a domicil both in the neutral and belligerant country; these supposed decisions cannot be reconciled with the dictates of justice, or the principles of reason, and it is, therefore, believed that they will not receive the sanction of the highest judicial tribunal of this country. 3. No specific ground has been taken by the captor's counsel, to support the appeal as to the remaining portions of the cargo. The claims are verified by the documentary evidence showing the goods to have been shipped by order, and for the account and risk of persons, subjects of, or domiciled in, a neutral country.
 Wheaton, in reply. 1. If the captors have improvidently closed the door, in the court below, upon the question, as to what amount of freight shall be paid to the master, it is still open as to whether any portion of the cargo is to be exempt from contributing to the payment of freight. That is, emphatically, a controversy between the captors and claimants: the master has nothing to do with it; he has been paid his freight, and gone away. The bringing in the vessel and cargo for adjudication, was not a wrong done by the captors to the claimants, who may ultimately prove to be neutral; it was an inconvenience to which the latter subjected themselves by lading their goods in the same vessel with enemy's property; and it is not for the captors to indemnify them by paying the freight of the neutral claimants' goods, as well as those which have become the property of the captors jure belli. 2. According to the claimant's counsel, the shipments by Messrs. Burnett & Co. were made by the hostile house, as the agents, and bona fide exclusively on the account and risk of the neutral house. On no other ground whatever can this case be extracted from the principle of the St. Indiano; and, upon that ground, the whole of the property ought to be restored, according to the limitations of the principle stated by the learned judge in the case of the St. Indianao. It is the domicil of the house, and the nature of its trade, and not the belligerant character of one of the partners, that avails to condemn: And it is a doctrine that may be vindicated upon every principle of reason and justice. Upon what principle is the property of a neutral subject, personally domiciliated in the enemy's country, liable to condemnation? Not upon the ground that his original national character is lost, but that his property is undistinguishably incorporated with that of the enemy, and employed exclusively in carrying on his trade, and strengthening his resources. Is not the property of a house of trade, established in the enemy's country, wheresoever the partners may reside, in the same predicament? It is believed that the decisions cited to support these principles, will be sanctioned by this tribunal; that they are corollaries from the rules of prize law which have already been sanctioned by it; that they are supported by all the analogies of that law, and are essential to its perfection as a system of jurisprudence impartially administered between belligerants and neutrals. The interest which a power at war has in maintaining the principles of these decisions, is obvious. What interest has a fair and just neutral in contesting it? His subjects may carry on their usual trade through its accustomed channels, untouched by the flames of war spreading on every side. Do they wish to export their commodities to the enemy's country? They may consign them to commission merchants there, or to their own supercargoes on board. Do they wish to import the productions of the enemy's country into their own? They may purchase them by the same instrumentality. Do they wish to become the carriers of both to every region of the globe? They may do it with impanity. A neutral merchant cannot, therefore, wish to be a partner in a house of trade in the enemy's country, unless for the purpose of lending his national character as a shield against the just rights of the other belligerant. It is by a more remote application of the same principle now contended for, that the property of persons taken in breach of blockade, as contraband of war, or sailing under an enemy's license, is liable to be considered as enemy's property, pro hac vice. It is taken adhering to the enemy, clothed with his character, and inseparably blended with his interests. This rule is precisely settled by the positive adjudications of the British prize courts, and there is reason to believe is practised in those of France and other countries. It is not one of those interpolations into the code of public law, of which that great civilian, by whom it is expounded, has been accused. This is not like the rule which prohibits to neutrals, in time of war, all trade not open in peace; nor like the rule which declares whole coasts and countries in a state of blockade, without investing or besieging a single port; nor like that which extends the infection of contraband to a return voyage; nor that which swells the list of contraband, with every article however remotely useful in war. Nor is it a rule of recent invention; at least, there is no evidence that the cases mentioned in the Vigilantia were decided contrary to the practice and opinions maintained by the British courts of prize, when this country was a portion of the British empire. 3. The remaining claims are said to be verified by the papers found on board. But how are these papers verified? It is well known that papers are a mere dead letter, unless supported by the testimony of living witnesses. When it is considered that the cargo was laden in the enemy's country, and the papers put on board by enemy shippers, only one of whom the master knows any thing about, so as to be able to swear, even as to his belief, it is not too much to say, that this part of the case requires farther proof to justify restitution of the goods as claimed.
 March 8th.
 STORY, J., delivered the opinion of the court, and, after stating the facts, proceeded as follows:
 
 
 1
 Upon the argument no specific objection was taken to the restitution of any of the property claimed, excepting that included in the claim of Messrs. Ivens & Burnett. This shipment was made by Messrs. Burnett & Co. of London, to Messrs. Ivens & Burnett of St. Michaels, and the invoices declare the goods to be by order, and for account and risk, of the latter gentlemen. It is contended, in behalf of the captors, that both houses are composed of the same persons, viz. William S. Burnett, who is domiciled at London, and William Ivens, who is domiciled at St. Michaels; and that the documentary evidence, and private correspondence, show that the shipment was made on account of the hostile house. If the fact of the identity of the two houses were material to a decision of the cause, it might furnish a proper ground for an order for farther proof. But admitting the fact to be as the captors contend, we are satisfied that it can be of no avail to them. It is clear, from the whole documentary evidence, that this shipment was not made on the account and risk of the hostile house, but bona fide on the account and risk of the neutral house. It does not, therefore, present a case for the application of the principle, that the property of a house of trade in the enemy's country is condemnable as prize, notwithstanding the neutral domicil of one of its partners. On the contrary, it presents a case for the application of the ordinary principle which subjects to confiscation, jure belli, the share of a partner in a neutral house, where his own domicil is in a hostile country. And, on this view, the decision of the circuit court is entirely correct, and is consistent with the doctrines established in the cases cited at the argument.
 
 
 2
 The next inquiry is, as to the freight decreed to the master. As no appeal was interposed to the decree of the district court, allowing the whole freight for the whole voyage, the question, whether more than a pro rata freight was due, (a question which would otherwise have deserved grave consideration,) does not properly arise. The only discussion which can now be entertained, is, whether the freight so decreed ought not to have been charged upon the whole cargo, instead of being charged upon a portion of it. And we are all of opinion that it was properly a charge upon the whole cargo. Although capture be deemed, in the prize courts, in many cases, equivalent to delivery, yet the captors cannot be liable for more than the freight of the goods actually received by them. The capture of a neutral ship, having enemy's property on board, is a strictly justifiable exercise of the rights of war. It is no wrong done to the neutral, even though the voyage be thereby defeated. The captors are not, therefore, answerable in poenam to the neutral for the losses which he may sustain by a lawful exercise of belligerant rights. It is the misfortune of the neutral, and not the fault of the belligerant. By the capture, the captors are substituted in lieu of the original owners, and they take the property cum onere. They are, therefore, responsible for the freight which then attached upon the property, of which the sentence of condemnation ascertains them to be the rightful owners succeeding to the former proprietors. So far the rule seems perfectly equitable; but to press it farther, and charge them with the freight of goods which they have never received, or with the burden of a charter party into which they have never entered, would be unreasonable in itself, and inconsistent with the admitted principles of prize law. It might, in a case of justifiable capture, by the condemnation of a single bale of goods, lead the captors to their ruin with the stipulated freight of a whole cargo.
 
 
 3
 On the whole, we are all of opinion, that the decree of the circuit court ought to be affirmed, except so far as it charges the freight upon the property condemned, and the moiety claimed by Messrs. Ivens & Burnett; and as to this, it ought to be reversed, and that the freight should be decreed to be a charge upon the whole cargo, to be paid by each parcel thereof, in proportion to its value.
 
 
 4
 Decree affirmed, except as to the freight.i
 
 
 
 i
 It has been held, that the charter party is not the measure by which the captor is, in all cases, bound, even where no fraud is imputed to the contract itself. When, by the events of war, navigation is rendered so hazardous as to raise the price of freight to an extraordinary height, captors are not, necessarily, bound to that inflamed rate of freight. When no such circumstances exist, when a ship is carrying on an ordinary trade, the charter party is undoubtedly the rule of valuation, unless impeached; the captor puts himself in the place of the owner of the cargo, and takes with that specific lien upon it. But a very different rule is to be applied, when the trade is subjected to very extraordinary risk and hazard, from its connexion with the events of war, and the redoubled activity and success of the belligerant cruisers. 5 Rob. 82. The Twilling Riget.
 
 
 c
 1 Rob. 1. The Vigilantia. 4 Rob. 31. The Jemmy. 3 Rob. 41. The Jonge Amelia, cited in the case of the Portland.
 
 
 g
 3 Rob. 101. The Race Horse. See also the Martha and the Hamilton, in a note to the same case.
 
 
 h
 6 Rob. 231. The Hoffnung.